### WHITE *v.* BOYCE.

*(Circuit Court, S. D. New York.* August 11, 1884.)

1. WRITTEN CONTRACT—PAROL CONTRACT TO MODIFY—ESTOPPEL.

   If, according to a written contract, one party was to transfer—upon specified conditions—certain shares of stock to another, who, upon receiving such transfer, was to pay therefor a specific sum of money, the latter party cannot be permitted to show by parol that he was not to acquire an unqualified right to the stock so agreed to be delivered to him, or that he did not assume an absolute obligation to pay for it at the price fixed.

2. SAME—PARTIES—ALLEGED AGENCY—ESTOPPEL.

   A party who contracts as a principal will not be permitted to show, in the absence of mistake, fraud, or illegality, that he contracted as an agent in a controversy between himself and the other contracting party, and the knowledge of the other contracting party does not affect the rule.

3. LAW AND EQUITY—COMMON-LAW RULE EMPHASIZED BY JUDICIARY ACT.

   Though courts of equity have concurrent jurisdiction with courts of law upon all controversies involving fraud, they will not ordinarily exercise it when the parties have an adequate remedy at law. Section 16 of the judiciary act (Rev. St. § 723) is intended to emphasize the existing rule, and to impress it on the federal courts.

4. SAME—MISREPRESENTATIONS—VALUE OF PROPERTY—ADEQUATE REMEDY AT LAW.

   Where the cause of action is for fraudulent misrepresentations affecting the value of property sold, and no relief is claimed except by way of damages, and no discovery is asked, and no complicated accounting is involved, a bill in equity will be dismissed upon the ground that the remedy is at law.

In Equity.

*Billings & Cardozo,* and *Cowles Morris,* for complainant.

*Marsh, Wilson & Wallis,* for defendant.

WALLACE, J. The complainant's bill is filed to enjoin the prosecution of a suit at law, pending in this court, brought by the defendant to recover damages against the complainant for the conversion of

5,900 shares of the stock of the Montauk Gas Coal Company. Five thousand four hundred of these shares belonged originally to the complainant, and 500 to the defendant. The complainant had pledged his 5,400 shares to the defendant as collateral security for certain liabilities of his to the defendant, and on July 19, 1880, the defendant transferred them, together with his own 500, to the complainant, to be held by him as trustee, for the purposes of a pool of the stock of the company, until February 1, 1881. After the expiration of the pool period (the stock still remaining in the possession of complainant) defendant demanded its redelivery, and, upon complainant's refusal to comply, brought the suit at law for its conversion. The present controversy does not concern the defendant's right to recover in the suit at law for the conversion of the 500 shares originally owned by him, and delivered to complainant for the purposes of the pool. But the complainant asserts that as to the 5,400 shares there was, at the time of the alleged conversion, nothing owing from complainant to defendant upon a fair accounting of their affairs together, and that he is the equitable owner thereof, although he has never satisfied the specific conditions of the pledge.

The 5,400 shares were pledged by the complainant to the defendant in the course of transactions between them growing out of the formation of the Maryland Union Coal Company, and the sale of the stock of that company; 2,400 shares being pledged about March 3, 1880, and 3,000 shares, September 27, 1880. The defendant was the owner of extensive coal property in Maryland, and engaged in mining coal, and resided at Baltimore; and the complainant was a dealer in coal and in coal stocks, residing at New York. Prior to November, 1879, negotiations took place between the parties in reference to placing the defendant's coal property upon the market. These culminated in the organization of a corporation,—the Maryland Union Coal Company; the transfer of the property by defendant to that corporation, in exchange for 49,995 of the 50,000 shares of the capital stock; and a written contract between complainant and defendant, made November 22, 1879, whereby defendant agreed to hold three-fourths of the stock of the corporation, subject to an option to the complainant to purchase the same. By the terms of the agreement defendant was to transfer to complainant one-quarter of the stock upon the payment by complainant of $287,500 in three months, another quarter upon a similar payment in five months, and the remaining quarter upon the payment of a similar sum in nine months. Upon complainant's failure to pay for the first quarter, as agreed, the option was to expire. Defendant was to pay $37,500 of each payment into the treasury of the company for working capital, and when the three-quarters of the stock had been taken and paid for by complainant, defendant was also to pay an additional $37,500 into the treasury as representing a contribution to the working capital of the corporation upon the quarter of the stock retained by him.

At the expiration of the time for the transfer of the first quarter· of the stock the complainant was unable to comply with the terms of the option. The terms were extended by defendant, and on March 3, 1880, a new agreement was made between the parties, reciting that complainant had paid for the first quarter of the stock under the option, and providing for an extension of time for the payment by him for the other two-quarters. At the time this agreement was made, and in order to facilitate the operations of the complainant in selling the stock to third persons, the parties entered into another agreement, by the terms of which defendant agreed to advance $150,000 to a bank in New York city for the purpose of enabling the bank to make loans on the shares of the company, and complainant agreed to keep $60,000 of the stock of the Montunk Coal Company in the hands of the defendant as collateral security to protect him against any losses that might arise from the loans that might be made by the bank. Under this agreement the defendant received 2,400 of the 5,400 shares of the gas company now in controversy. September 27, 1880, the complainant wished to obtain 1,000 shares of the coal company stock, which he had agreed to deliver to purchasers. He obtained these shares from the defendant, and as security for $25,000, the purchase price thereof, made a pledge of 3,000 shares more of the stock of the gas company. This stock was then in the custody of one Bush for the purposes of the pool in the stock of that company before referred to, and the pledge was made in form by Bush.

The facts are undisputed that a loss resulted to the defendant arising from the loans made by the bank out of his moneys, and to secure which the first pledge was made by complainant; and also that defendant has never been paid the $25,000 for the stock obtained of him by complainant as security for which the last pledge was made by complainant. But the complainant's theory is that, throughout all the transactions between the parties, he was only the agent of the complainant in effecting a sale of his mining property; that the Maryland Union Coal Company was organized, and the two agreements giving complainant an option to purchase its stock were made, for the purpose of putting the stock upon the market, and to enable the complainant to obtain subscriptions and sell the stock to others as the agent of the defendant and for his benefit; that, in fact, it was agreed between the parties that complainant should receive for his services in the matter all proceeds of the sale of the stock above the sum of $22 per share; that the defendant had represented to him that the coal lands contained at least 350 acres of big-vein coal, which fact, if true, would have made the property extremely valuable; that, relying upon this agreement and the representations by defendant as to the big-vein coal, he had, in fact, placed 18,400 shares of the stock with third parties, who had agreed to purchase the same at the price of $30 per share; that after he had sold part of

the stock, and before the remainder had been delivered to or paid for by the persons who had agreed to take the same, it was discovered that the defendant's representation as to the big-vein coal were untrue, and the complainant was unable to induce those who had agreed to purchase the stock to carry out their agreements, and in consequence thereof he sustained a loss in a sum more than sufficient to satisfy any claims of the defendant upon the stock of the gas company pledged to him; and that by reason of the premises he is entitled to recover $142,000 of the defendant as damages upon a fair accounting.

The proofs undoubtedly authorize the conclusion that the coal company was organized for the purpose of enabling defendant to dispose of his coal property by exchanging it for the stock of the corporation and selling the stock, and that the option for the purchase of the stock given to complainant by the contracts of November 22, 1879, and March 3, 1880, was given in order to carry out that object, and enable defendant to dispose of three-quarters of his interest in the property. It is also apparent that the defendant understood that complainant intended to place the stock with subscribers, or sell it to purchasers, and thereby obtain the means of carrying out his option contract. Whether, in carrying out this plan to effect a sale of the defendant's property, it was the intention of the parties that the relation of principal and agent should exist between themselves, or whether it was intended that the complainant should occupy the position of a speculator on his own account, instead of a fiduciary, are questions as to which there is much conflicting testimony. Concededly, if there was any agreement between the parties other than that expressed in the written contracts between them, it was made prior to or contemporaneously with the written contracts. However the fact may have been, no inquiry into the preliminary or contemporaneous negotiations of the parties is competent for the purpose of showing that they were dealing together as principal and agent, because extrinsic evidence to this effect would contradict or vary the legal import of the written contracts. By these contracts the defendant agreed to transfer certain shares of stock to the complainant, upon specified conditions, and the complainant agreed, upon receiving such transfer, to pay therefor to the defendant a specific sum of money. The complainant cannot now be permitted to show by parol that he was not to acquire an unqualified right to the stock which was to be delivered to him, or that he did not assume an absolute obligation to pay for it, when delivered, at the price fixed; and such would be the result if he should be allowed to prove that he was to sell the stock to third persons as an agent for defendant, and was to account to him at the rate of $22 per share. He who contracts as a principal will not be permitted to show, in the absence of mistake, fraud, or illegality, that he contracted as an agent, in a controversy between himself and the other contracting party. Whart. Ag. §§ 410,

492. And the knowledge of the other contracting party of his real character does not affect the rule. Taylor, Ev. § 1054. The case is not like those where a part only of a verbal contract has been reduced to writing, (*Potter* v. *Hopkins*, 25 Wend. 417; *Batterman* v. *Pierce*, 3 Hill, 171; *Grierson* v. *Mason*, 60 N. Y. 394,) or where an agreement collateral to the written agreement is set up, (*Lindley* v. *Lacey*, 17 C. B. (N. S.) 578; *Chapin* v. *Dobson*, 78 N. Y. 74; *Crossman* v. *Fuller*, 17 Pick. 171,) which does not interfere with the terms of the written contract, though it may relate to the same subject-matter. The written contract here is of the very essence of the transaction between the parties, and creates the relation of vendor and purchaser between them. It fixes their mutual rights and obligations, and cannot be subverted by extrinsic evidence. As is stated by DENIO, J., in *Barry* v. *Ransom*, 12 N. Y. 464, "the legal effect of a written contract is as much within the protection of the rule which forbids the introduction of parol evidence as its language."

It is not claimed that there was any subsequent modification or change in the relations of the parties. The complainant's right to relief must therefore rest upon the theory that his vendor misrepresented to him material facts affecting the value of the stock purchased. If it should be assumed that his allegations in this regard are established by the proofs, he must fail, because his case does not entitle him to any equitable relief. No facts are alleged in the bill as a foundation for an equitable set-off; no discovery is asked; and no facts exist which tend to show that the complainant has not a plain, adequate, and complete remedy at law to recover such damages as he may have sustained. While courts of equity have concurrent jurisdiction in all cases of fraud, they will not ordinarily exercise it, if there is a full and adequate remedy at law, (Bisp. Eq. § 200; *Ambler* v. *Choteau*, 107 U. S. 586; S. C. 1 Sup. Ct. Rep. 556,) and the federal courts are especially admonished not to entertain such cases. The statutory enactment, (section 16 of the judiciary act, Rev. St. § 723,) if only declaratory of the pre-existing law, is at least intended to emphasize the rule and impress it upon the attention of the court. *New York Co.* v. *Memphis Water Co.* 107 U. S. 205; S. C. 2 Sup. Ct. Rep. 279. It is the duty of the court to enforce this rule *sua sponte*. *Oelrichs* v. *Spain*, 15 Wall. 211; *Sullivan* v. *Portland R. Co.* 94 U. S. 806. It would therefore not be proper to assume to determine the ques'ion of fact whether any misrepresentations were made to complainant by defendant.

Jurisdiction properly assumed, upon one aspect of the controversy, would authorize the court to proceed to a decree which would do full justice in the case upon all its branches. But unfounded claims of a character cognizable in equity cannot be made the basis of relief respecting other controversies between the parties which are cognizable only at common law.

The bill is dismissed, with costs.